Good afternoon, Your Honor. As they may please the Court, I would request to reserve three minutes for rebuttal. I'm not sure whether the... Do you want to identify yourself? Mary Chapman, Your Honor, for the appellant. Mr. Riddle. Go ahead. This case is an employment discrimination case and one of reverse discrimination that is here on appeal from the district court on a motion for summary judgment. And while the district court did articulate the proper standard in their order, they did fail to properly apply that standard to the evidence that was presented during the motions for summary judgment. Could you tell me, you used the term reverse discrimination. The statute in the law doesn't say reverse. It talks about discrimination. Is there some different test that we have to apply because a white petitioner is involved here? Absolutely not, Your Honor. The same standard applies regardless of race. So it's a discrimination case. It's a discrimination case. In looking at the discrimination case, there are, you know, two methods to prove the discrimination case, either first through direct or circumstantial evidence that the discriminatory reason was the motivating factor for the employment discrimination, or using the second test, which is used as the burden-shifting test through the McDonnell-Douglas. Now, this case has substantial direct evidence that shows that discriminatory reasons motivated and were present in this case. And that direct evidence was ignored by the district court. Direct evidence includes. Why don't you – what's an example? Or what is the direct evidence that you have? The direct evidence includes the fact, Your Honors, that the decision-maker in this case, Mr. Washington, who was the then chief of the fire department, made discriminatory comments. And as the Court stated in the Cordova case – Sorry. What discriminatory comments? Could you give us an example? Yes, Your Honor. Specifically, the record indicates that Mr. Washington made comments such as – and I'm going to use the word in my language – kiss my black ass. Who did he say that to? Ms. Clevin. And who – and did she vie directly? She witnessed that, heard that statement directly come from him. All right. And when was that? He was chief at the time? Yes. He was chief at the time. Okay. In addition, there were – there is specifically a complaint made to the fire department union president when two firefighters made a formal complaint against the chief to the union president because the chief made the comment that he had crackers waiting outside his door. The union president identified those firefighters as Xavier Flores and Rick Lockerley. And so did they corroborate that that's what they told him? The record in the district court does not contain any direct testimony from those two firefighters. The testimony is only from the union president in his capacity as such. So he's relating hearsay, in other words. Yes, Your Honor. He is relating a statement that was made to him in his official capacity as the union president. That doesn't remove – that doesn't eliminate his hearsay quality, does it? No, Your Honor, it does not. Okay. Isn't that the reason why the district judge didn't accept that, was because of the hearsay problem? That particular statement, yes, Your Honor, that was. However, the district court also negated the other statements, which there was no justification for the hearsay. The statement that was made to Ms. Clevin, for instance, that there was a direct statement made by him to Ms. Clevin. In addition – What was the statement made directly to her? It was made in her presence that people could kiss his black – kiss my black ass. In addition, Mr. Fletcher also testified that the chief on numerous occasions said that he was pro-black. I thought – I thought her testimony went to Linda Willis's, the secretary, that she was repeating what she had heard. No, sir. If you – no, Your Honor. If you look at the record on page 42, lines 9 – page 9 of the deposition transcript, lines 20 through 21, she testifies that she actually heard Washington say, In addition, Mr. Fletcher testified that he on numerous occasions had heard the chief say that he was pro-black. The other issue – Sorry. Who said that? Mr. Fletcher, Your Honor. But he also said that – something about not being anti-white, but pro-black. Yes, Your Honor. And he – when did he say that? And he said that to Mr. Fletcher? Yes, Your Honor. He said that in Mr. Fletcher's presence. Okay. And he was chief at the time? Yes, Your Honor, he was. Okay. There's also testimony in the record and direct evidence in the record that Mr. Fletcher had a strong policy of promoting black firefighters, African Americans, and carrying on what was classified – what was considered by some to be his own affirmative action program. And they gave specific examples in their testimony in that the chief, in one instance, held open a position and did not fill it, although there were qualified individuals to fill that position, because he wanted to hold the position open until an African American firefighter was off probation and would then become eligible for promotion. When that black firefighter was off probation and eligible for promotion, the chief did, in fact, promote that African American into that position that he had held open. There's also testimony that he, on at least two occasions, intervened in instances where African American firefighters were going to be terminated under department policy, and he prevented those terminations. There was direct testimony – Excuse me. That was when he was chief? Yes. And when did those occur? There is no specific dates in the record. There are instances and names of those who were assisted in the record, but they did not provide the actual dates in the record as to it happened on, you know, December of such and such a date. There was no specific dates. Are the people identified? Do you have the record site for those? Preferential promotions given to African Americans was – Excuse me. Are you giving me the sites? Yes, Your Honor. I was going to. I was just delineating what they were going to be for. Giving – the chief giving preferential promotions to African Americans occurring with Mr. Campbell and Mr. Washington occurs in the record on page 63. The deposition page is 8, lines 3 through 11. And that was Mr. Fletcher's testimony. And intervened on behalf of? Are you talking about when he attended personnel meetings on behalf of African American employees? Yes, Your Honor. Excerpt from Record 60, Shelbourne Deposition 23 at 17-24. Thank you, Your Honor. You're welcome. And you don't know the year in which that happened? No, Your Honor. The record does not specify that. That's not the time when he was acting as a union rep? No, Your Honor. It was not in his – the record, the reading of the record does not indicate that, but as the Court may or may not know, I was not the attorney of record in the district court proceeding, so I can't answer your question. And the record is not specific to that. So I can only go on what is on page 63. My understanding is some of these events happened 14 years before, back in 1991? The testimony from Mr. Shelbourne all takes place in events prior to Mr. Washington becoming chief of police. And Mr. Shelbourne's testimony in the – Chief fire department chief. Yes. Not chief of police. No, chief of the fire department. Mr. Shelbourne's testimony in the record indicates that there was a long history of advocating for African Americans by Fire Chief Washington, even prior to his becoming fire chief, and that his advocacy, he was extremely vocal in supporting African Americans, and he was vocal in expressing the fact that African Americans should receive a break to make up for past discrimination. And Mr. Shelbourne also testified prior to becoming chief, Mr. Fire Chief Washington would intervene on behalf of African Americans, but would not intervene on behalf of other firefighters. So he was a union rep. Isn't that what he said? Well, the union reps usually advocated for both black and white, and David would be absent from the white ones and present for the black ones? That's correct, Your Honor. That is the testimony of the record. Right. So he wasn't chief and he was a union rep. During Mr. Shelbourne's testimony, that is correct, Your Honor. There is also testimony from multiple witnesses that Fire Chief Washington on numerous occasions made comments about needing more black faces in the fire department, and when he became chief, specifically, that they needed more black faces in management. Counsel, my problem is a lot of those references you're making are based on double hearsay or hearsay. So the district court made a point of discounting or not looking at hearsay statements. So I'm looking for, you know, what's being repeated because someone who's a precipitate witness, at least, not repeating what somebody told them or what's going around the workplace. All of these cases are highly charged and there are lots of things that get said around the workplace, some of which is pure speculation and some which may be, in fact, true. So that's. I do understand that, Your Honor. And Mr. Shelbourne's testimony specifically states that he heard Mr. Washington say that there needed to be more black faces. That's on the record, page 58. Deposition page 14, lines 13 through 18. In addition, Ms. Clevin testified that Mr. Washington expressed an attitude and body language that indicated his racial preferences. That's in her deposition testimony on the record, page 14. Deposition page 10, lines 16 through 19. You're into your three minutes, so if you want to save the time, you may. Yes, Your Honor. Good afternoon. May it please the Court. My name is Brad Jerbik. I'm the City Attorney of Las Vegas, representing the Appellees, David Washington and the City of Las Vegas. Based on the comments I heard the Court made, I'm not going to repeat what's already in the briefs. I think the question is fairly simple. It's before you here today. I think the McDonnell-Douglas test is what applies to a motion for summary judgment in a case like this. I think that counsel for the opposition identified that as the standard. I think that the lower court applied that test appropriately, although I would take the issue with the first part. I'm not going to argue that. They found that the four elements necessary to establish a prima facie case were present. I'm not going to argue that. Isn't it that that's an alternative method, but you can also use direct evidence. You don't have to go to McDonnell. Your adversary was focusing upon the direct evidence issue. I take it you want to focus now on the McDonnell and show why that was insufficient evidence to get past summary judgment. But that would not interfere with what she's been arguing, that there's enough direct evidence to get past summary judgment. Right. That's exactly correct, Your Honor. There are two ways to establish a prima facie case. One is the four-part test under McDonnell-Douglas. The other is direct evidence of discrimination. The district court judge found the prima facie case. I'm not going to sit here and re-argue that, but I will say that with respect to the other. Are you sure you understand the posture? I do. I'll tell you where I'm going. The same evidence that you use in establishing the prima facie case can also be considered in the argument for pretext when you get to the third part of the test. I understand that, but we're talking about you don't go to McDonnell-Douglas at all if there's direct evidence. I understand, Your Honor. Okay. So she has now said, she's now cited. I don't want you to use up all your time counteracting each one, but you're relying on your brief to justify why some of these statements that she's cited are not sufficient for direct evidence. Some are hearsay. That's correct. That you've argued. Some may not be hearsay. That's correct. Some may be, and you're confident on your brief. If you are, I'm not, I just want to make sure you. I'm absolutely confident on the brief, and I would just like to hit on those two things very quickly. When we were talking about the use of the term cracker, you saw in both the brief, you saw in both the testimony, that that is kind of a, I heard somebody who heard somebody who heard this was said. That is at least double hearsay, completely inadmissible. The district court found appropriately that that is not direct evidence that can be considered in establishing the prima facie case. The other things that were said, the worst probably was kissed my black ass in the context that it was said. The chief had roundtable discussions with everybody on his staff, and they had these free-for-all kinds of discussions that you might imagine firefighters having in exchanging ideas. If that statement did come out, it's not in any context. It's not focused on any kind of discrimination. I don't think you have to worry much about that. That wasn't very persuasive. What was troubling to me is the district court overlooking some of these statements that are not hearsay that can come in about his own affirmative action program, wanting more black faces here and such as that. Those are the real dynamite part. Now, I want you to just take this as a hypothetical. Suppose Washington is white and Riddle is black. Do you think there would be enough there for us to say that summary judgment should not have been granted? No, and I will tell you why. Okay. All the testimony that you look at some of our cases, and they're pretty hard not to say so. So go ahead. No, I understand. I understand. But let's look at it in the context. This isn't a white person saying they don't want black people. This isn't a person saying as a black person I want to get rid of white people. This is a black person as far back as 1992 or earlier. Shelbourne stopped working for the fire department in 1992. And all of that testimony regarding black faces or wanting to promote a black agenda or wanting to see more black people in line come from 1992 or before. He started in 1967. He was with us for a very long time. That's right. He was introduced for a philosophical reason. This is his belief. This is how he feels. I understand the weakness of it, but it isn't immaterial evidence. I don't think it's immaterial. But at the same time, I think we live in a society where we promote diversity. We want to see everybody have an equal opportunity. When we have somebody who becomes a union rep and a senior leader in the fire department who happens to be African-American, I don't think there's anything wrong with him saying, I would like to see more African-Americans apply, more African-Americans in the academy. That doesn't in any way suggest an anti-Hispanic agenda, an anti-white agenda. And in the context in which it was said, in the time in which it was said, so far before any employment action against Mr. Riddle, I think it's completely irrelevant. If he has responsibility towards the union, doesn't he have responsibility for all people, regardless of their color? I agree. So in that capacity, if he is indicating that I have a preference for black people, he's not going to be treating us the same. I mean, it is not a fit, as you indicate, that he can have reverse discrimination. That is, his own affirmative action program in that role, either as the union representative or as the chief. So what bothers me is, was there sufficient evidence? Was there a fact, material fact, in conflict? Washington may win this trial, but that's not the issue. Was there enough there that they should not have given summary judgment because it was in dispute and should have gone on? With all respect, Your Honor, if an individual who is of a particular minority group makes a statement advocating a desire to see more minorities in a department, does it in any way use that union power against other groups but merely says, I'd like to see more people apply, I'd like to see more people in the academy, I'd like to see more people become EMTs? And he says those things literally 25 years or 20 years before employment action is taken against one of his chiefs, and that is enough for a triable fact? We're going to need to be hiring a lot more Federal judges in this district because this stuff happens all the time. It is not in any way evidence of discrimination or disparate race treatment. I think an individual in Chief Washington's position back at the time he made these that he was advocating those types of positions later on. That testimony, all of it comes from Chief Shelbourne, who is retired in 1996. How about the Campbell situation? The Campbell situation, I think, largely reflects a friendship. I think if you read the entire transcript, Chief Washington's affection for Gene Campbell doesn't come from the fact that he's black. It comes from the fact that they were roommates together at the academy. They started their firefighting careers together. Well, let's see. The testimony is, as I understand it, that he didn't have much experience. He was an investigator, and he was promoted pretty high over other people, that Chief Washington wanted to be succeeded by an African-American. All of that seems to be at least tangible evidence of the Washington issue, that he was grooming him to be his black successor, which he stated he wanted. Is that sufficient evidence to go to a trial, or is it not? It isn't, Your Honor, and I'll tell you why. That testimony comes from Dean Fletcher, and if you read the transcript, it isn't as clear as your question would make it seem. When Dean Fletcher testified as to the Chief's position, he said, well, I knew it. This is how I felt. Everybody knew it. But he couldn't articulate a single statement, a single incident, a single hard fact that would establish it, other than it was Dean Fletcher's opinion. And I can go back to the transcript. Let me see if I can find some specific examples here while I'm arguing. But you would constantly hear Dean Fletcher say, this is page 9. Excuse me, page 6, page 7 of his transcript. The only thing I ever heard him say was his famous phrase that I'm not anti-white, I'm pro-black. This is Dean Fletcher's testimony, quoting Chief Washington. The next sentence, did you ever hear him say he wanted to promote African Americans within department? I know that was his goal. I didn't ever hear him say that. Well, as he goes throughout this testimony, you'll hear things like that repeated over and over and over again. I know that's what he believed, but he never said it. I know that's what he believed, but everybody knew it. If that's enough for trial is what he thinks in his mind, his speculation, I just think it falls far short of the kind of evidence necessary to go to trial on this kind of issue. Can you turn to the issue of other evidence? Maybe we could go. We're going to spend all day on direct evidence. Can you address the pretext issue? There are a couple of things that trouble me on pretext, and that is the letter of recommendation or the recommendation made, glowing recommendation. Harvard School? To the Harvard School, which seems to contradict the criticisms and reasons for terminating Mr. Riddle when he said he lost all confidence in him and the like. And yet, but in 2006 or whenever it was, he was writing this very positive review. The only thing I can say is when I read this for the first time, I thought to myself, if this really were a situation where the chief becomes the chief and decides he wants to clear house for another African-American to succeed him, he had many golden opportunities prior to the final one, and he didn't take advantage of any of them. These only took four months apart. Right. The auditory letter and his firing. And I think it can best be explained by some of the testimony you'll see in the transcript that the chief talked the talk but didn't walk the walk. His staff was all over him for saying, I'm hard on people for this, but nevertheless giving second chances. As you saw, Riddle, the district court found that Riddle did his job in spite of all the things that were a basis for his termination, which I thought was interesting. But you will find nowhere in the record that he wasn't a good EMT technician, but you will find a number of things that are terribly troubling with having an employee last long term. Chief Washington, I cannot speculate why he did what he did, but he did take action. It wasn't just a matter of he wrote a glowing letter. There were a number of incidents that led to the termination. One, Riddle doesn't attend the very first staff meeting after the chief is selected. He says it slipped his mind. The chief lets it go, showing kind of where the chief's mindset is on a lot of these things. He would disappear from work for hours at a time inexplicably. The chief dealt with it verbally. He was smoking in his office and denied it, lied to the chief. The chief nevertheless told him to knock it off. Then come the very serious incidences where he misuses the International Association of Fire Chiefs credit card, says he got the wrong one out of his wallet. The chief does nothing about that, saying, I guess it's not on city time, not your city duty. It's relating to this extracurricular activity that you're doing. Then comes a very interesting incident just very shortly thereafter where he goes to a casino making $200 withdrawals multiple times in a row. This is not a mistake. At this point in time, he is disciplined. He gets 120 hours of annual leave deducted. He gets limited travel time on training. He has no payment of professional dues, et cetera, et cetera. He's not allowed to act as acting chief. It wasn't that all of a sudden he was just performing wonderfully and nothing happened and he dropped him off the cliff for smoking a cigarette. He gave him some very, very, very serious punishment for the misuse of this credit card. Finally, Riddle admits that he lied to the chief and had been smoking in his office and in his car and promises that he's not going to do it again. The getting drunk at the reception thing, I'm going to pass over. It's not a good thing. It's not a good thing. It's from the department, but I'll admit that was not on company time. But I'd like to go back to the cigarette thing. We have a city policy and a state law that prohibits smoking in public buildings and public places. He has a public car. He's not allowed to smoke in it. This nonsense that it's before work time or after work time doesn't matter. He's in a city vehicle and he's been told not to do it and he does it twice. I think if you look at that incident and that incident all alone, we're going to trial on this issue. But if you look at these other six things that preceded it, Riddle had a clear pattern of feeling burned after he didn't get the job, behaving in a way that was ultimately getting to a point where he lost the confidence of the fire chief, lied to his boss, made promises he couldn't keep, and the chief is beginning to lose the respect of his own staff. That's in the transcript where they said you pretty much walk the walk and or talk the talk, don't walk the walk. You don't take actions that are as hard as what you suggest. And finally, he has enough and he gets rid of it. I think that is more than enough evidence to overcome any argument that this was a pretextual firing. His letter of recommendation, which was a very glowing letter, his continued merit increases, his increases in pay. What was the time that that was occurring in relationship to the firing? The Harvard letter, I believe, was just a few months before the firing. The merit increases occur once a year. I don't have the exact dates. I didn't take as good a note on that as I probably should have. I would note that he did not get a merit increase every year. And the chief himself testifies, or it's in his statement, that he got a 7.5 out of 10 on his last evaluation. Well, the last I checked when I was in Catholic school, if I got a 75 out of 100, that was a C. That was not a glowing recommendation. I'm not saying that he was a failure. I'm saying he did not get a 10 out of 10 or a 9 out of 10. I'm wondering where the glowing recommendation he did give him in the letter fit into the other things you've been talking about. I don't know. I really wish I could tell you. I do know that the chief is a man who has a great deal of hope in giving people second chances. And that's throughout the record supported. You can find it. You said, I know. I'm sorry. I should apologize for that. The record supports the fact that the chief has been a very forgiving man when it comes to Ken Riddle. He has a pattern, almost, of trying to be the dad to the awkward or the bad son, trying to be the one who gives him the gentle corrective, suggestive language, tries to give him the encouragement. And the fact finder may agree with you. But the real question is not that. The question is, did he have enough to get to the fact finder? I believe, following, again, the test, we're down to whether or not this was a pretextual firing. I do not believe there was a prima facie case or any case established that there was discrimination. I don't think that Ken Riddle was doing his job. And I think the statements that were used by Mr. Riddle to establish it were either hearsay or out of context or, in some context, you couldn't even know where they came from. You disagree with the district judge. Did you appeal on that basis? No. Okay. We are not the appellants. And we did not cross-appeal. Okay. Thank you, counsel. Thank you. Mr. Chapman, would you agree that your client was not a perfect employee? Yes, I would agree that he was not a perfect employee. However, I disagree with the characterizations. First of all, he was terminated for the given reason that he was smoking in his vehicle, yet the city never conducted an investigation, and my client denies the allegation at the time. Now, as a public employee, he's entitled to due process, and it is, you know, evidence of discriminatory intent in and of itself to not have an investigation conducted. Why would you not investigate it when you have somebody who is denying that allegation, as well as, you know, he denied several other allegations that the chief has made? The district court discounted Mr. Riddle's affidavit, saying that it was self-serving. However, you know, the test for an affidavit is whether it actually contains explicit, factual allegations in it. And he factually denied certain allegations that were brought forth by Chief Washington and specifically denied those allegations. And in addition, he gave specific instances of racial animus in which he was not allowed to serve as acting chief, although others were. He was only permitted eight administrative days off as a limit, although the district court found that there was no evidence as to the circumstances of others or specifics. Did the district court misstate? Your Honor, there's only four deputy – there's only four of them. There's only four. Did – that's not answering my question. The district court said there were no specifics, not as to the identities alone, but to the circumstances. Well, if you look at the affidavit – Just for – you don't create a material issue of fact by saying I was discriminated against and others were treated better than I. You have to go beyond that to create a material issue of fact. I understand that, Your Honor. So what did Mr. Riddle put in to make – Mr. Riddle specifically stated that when he attended a – the Congressional Fire Service Institution dinner, he had to do so in his own time. However, Chief Campbell, who was an African-American, went on department time. There was a very specific, desperate treatment between an African-American versus himself. That appears in his affidavit. Also appearing in his affidavit is the fact that he was specifically limited to eight hours of administrative leave while the other chiefs were not. Why don't you move over to the withdrawals from the union credit card at casinos to go gambling? What about that? Mr. Riddle admitted in his affidavit he did that on both occasions. He discovered those errors himself and corrected them and returned the money. I mean, the fact that, you know, we live in Las Vegas and gambling is legal. You can't punish somebody for conducting – you know, conducting themselves on a legal basis. And the fact that he made a mistake, recognized his mistake, and corrected – immediately corrected his mistake is hardly something that's punishable. And if it is something that's punishable, then why is it public employees' personnel file not being – those entries put into it? If this was truly meant to be discipline, then discipline, especially in the public sector, always ends up in your personnel file. But yet there was not a single piece of disciplinary action in Mr. Riddle's personnel file. Then the other thing that is of interest is the district court discounted the merit increases, but yet it was the city who got rid of his employment evaluations that had the details listing how he came up with this total number. The detailed employment evaluation was removed from his personnel file by the city. Why isn't there not an adverse inference? They were responsible for maintaining that personnel file. Why did they remove it? Because they didn't want us to see the glowing things that were written in it that came up with those numbers, that came up with those merit increases? When you look, even if you get past the direct evidence, and I don't think you get past the direct evidence, but even if you do get past the direct evidence and end up at Mount McDonnell Douglas, you have to completely accept, first of all, all of that direct evidence as part of the pretext. And then on top of that, you have to use the fact that after the fact they tried to bolster their determination for smoking by bringing up things that happened years in the past that were never in his personnel file. Then you also have to look at their failure to investigate the smoking incident itself, even though he denied the allegation. Then you have to look at the fact that they removed materials that could be helpful to Mr. Riddle from his personnel file, even though they're in charge of maintaining that personnel file, that there was a complete lack of discipline in his personnel file at all, and this is a public inquiry. Kennedy, you're repeating yourself. You are over time, so I think we have the argument. Thank you. Case argued is submitted, and thank you both for your arguments.
judges: Mills, Wallace, Fisher